WISCONSIN MALL PROPERTIES, LLC,
a Delaware Limited Liability Company,
Plaintiff-Appellant-Petitioner,

v.

YOUNKERS, INC., Saks, Inc. and Parisian, Inc.,
Defendants-Respondents,

CITY OF GREEN BAY and
City of Green Bay Redevelopment Authority,
Intervenors-Respondents.

Supreme Court

*No. 2005AP323. Oral argument April 27, 2006.
—Decided July 11, 2006.*

2006 WI 95

(Also reported in 717 N.W.2d 703.)

For the plaintiff-appellant-petitioner, there were briefs by *Gregory B. Conway* and *Liebmann, Conway, Olejniczak & Jerry, S.C.*, Green Bay; *Katherine Stadler,*

*Jennifer L. Peterson, Brady C. Williamson,* and *LaFollette Godfrey & Kahn,* Madison, and oral argument by *Katherine Stadler* and *Gregory B. Conway.*

For the defendants-respondents, there was a brief by *Alan H. Marcuvitz, Amy V. Kossoris,* and *Michael Best & Friedrich LLP,* Milwaukee; *Gerald L. Angst,* and *Sidley Austin LLP,* Chicago, IL, and oral argument by *Alan H. Marcuvitz.*

For the intervenors-respondents, there was a brief by *Allison C. Swanson* and *Green Bay City Attorneys Office; Benjamin Southwick* and *Benjamin Southwick Law Office,* Richland Center, and oral argument by *Benjamin Southwick.*

¶ 1. ANN WALSH BRADLEY, J. Petitioner Wisconsin Mall Properties, LLC, seeks review of a published court of appeals' decision affirming the circuit court order that dismissed on summary judgment its breach of contract claim against respondents Younkers, Inc., Saks, Inc., and Parisian, Inc.[1] The City of Green Bay and the City of Green Bay Redevelopment Authority, intervenors, condemned property owned by Wisconsin Mall that was the subject of a lease between Wisconsin Mall and Saks.

¶ 2. The dispute centers on whether Wisconsin Mall's remedies for the damages it seeks must be had in Wis. Stat. ch. 32 (2003–04) condemnation proceedings or whether it may seek a remedy against Saks via the

---

[1] *See Wisconsin Mall Props., LLC v. Younkers, Inc.,* 2005 WI App 261, 288 Wis.2d 463, 707 N.W.2d 886 (affirming an order of the circuit court for Brown County, William M. Atkinson, Judge).

When referring to one or more of the respondents, we refer to them simply as "Saks."

contract action before us.[2] Wisconsin Mall asserts that the circuit court erred in concluding that the existence of condemnation proceedings precludes it from maintaining a breach of contract claim.

¶ 3. We determine that Wisconsin Mall is not necessarily precluded from seeking a remedy against Saks in this breach of contract action. Whether Wisconsin Mall may seek a remedy against Saks here will depend on the terms of the lease as interpreted and applied to the facts of this case. It will also depend on whether Saks in fact breached the lease and on what damages would be due Wisconsin Mall under the lease for such a breach.

¶ 4. When these questions are answered, it can be determined whether Wisconsin Mall is entitled to contract damages against Saks that exceed what it has received as just compensation under ch. 32. In other words, it can be determined whether Wisconsin Mall is confined to condemnation court, or whether it is ultimately entitled to a remedy against Saks in this contract action.

¶ 5. Because the circuit court erroneously granted summary judgment on the theory that the existence of condemnation proceedings precluded Wisconsin Mall from seeking contract remedies against Saks, it did not address whether there exist any genuine issues of material fact as to breach and damages. Accordingly, we reverse the court of appeals' decision that affirmed the circuit court, and we remand to the circuit court for further proceedings consistent with this opinion. Upon remand, the circuit court will be able to determine whether there exist genuine issues of material fact.

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version.

# I

¶ 6. In 1993, Saks sold to and leased back from UTFMW Limited Partnership eight department stores, including a store in downtown Green Bay. Wisconsin Mall acquired the Green Bay store property and the lease in 1994.[3]

¶ 7. In 2001, Saks began negotiating with the City of Green Bay for a possible condemnation of the property.[4] According to Wisconsin Mall, Saks wanted the City to use its condemnation power so that Saks could extricate itself from the lease.

¶ 8. Wisconsin Mall was involved in the condemnation negotiations until at least the fall of 2001. In October 2001, Wisconsin Mall's managing member sent an email to the City's mayor indicating that Wisconsin Mall was willing to consider a "friendly condemnation of the building." At some point after that, however, the prospect of a "friendly" condemnation between the City and Wisconsin Mall apparently soured.

¶ 9. On April 8, 2003, the City and Saks entered into a "retention agreement" under which the City agreed to condemn Wisconsin Mall's property and the lease. The City also agreed to indemnify Saks against any claims arising out of the condemnation, including claims by Wisconsin Mall for Saks' continuing obligations under the lease. Saks, in turn, agreed to convey its interest in another store property to the City and to

---

[3] Wisconsin Mall explains that the sale and leaseback agreement actually served as a financing vehicle. Throughout this opinion, we refer to this agreement as the "lease."

[4] Whether referring to the City of Green Bay, the City of Green Bay Redevelopment Authority, or both, we refer to "the City."

contribute $2.75 million toward the City's costs in condemning Wisconsin Mall's property.

¶ 10. On August 13, 2003, Wisconsin Mall provided Saks with written notice of its belief that Saks was in breach of section 5.1 of the lease. This section of the lease provided that "Lessee covenants and agrees that it will remain obligated under this Lease in accordance with its terms, and that Lessee will not take any action to terminate, rescind, or avoid this lease . . . ."[5]

¶ 11. Using its eminent domain power under ch. 32, the City made a jurisdictional offer of $5.7 million to Wisconsin Mall in October 2003. The offer allocated $2.6 million for "[l]oss of land including improvements and fixtures actually taken (reversionary interest in real estate)" and $3.1 million for "present value of Lessor's interest in Lease."

¶ 12. Subsequently, Wisconsin Mall filed this breach of contract action against Saks. It alleged a breach of sections 5.1(b) and (c) of the lease. Section 5.1(b) of the lease included a so-called "hell or high water" clause, which indicated that, except as otherwise provided in the lease, the lessee's obligations under the lease would not be affected by a condemnation:

Except as otherwise expressly provided in the

---

[5] More specifically, section 5.1(c) of the lease provides as follows:

Lessee covenants and agrees that it will remain obligated under this Lease in accordance with its terms, and that Lessee will not take any action to terminate, rescind, or avoid this lease, notwithstanding the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Lessor or any assignee of Lessor in any such proceeding and notwithstanding any action with respect to this Lease which may be taken by any trustee or receiver of Lessor or of any assignee of Lessor in any such proceeding or by any court in any such proceeding.

Lease, this Lease shall not terminate, nor shall Lessee have any right to terminate this Lease or be entitled to the abatement of any rent or any reduction thereof, nor shall the obligations hereunder of Lessee be otherwise affected, by reason of . . . the taking of the demised premises or any portion thereof by condemnation or otherwise . . ., *or for any other cause whether similar or dissimilar to the foregoing,* . . . it being the intention of the parties hereto that the rent and all other charges payable hereunder . . . shall continue to be payable in all events and the obligations of Lessee hereunder shall continue unaffected, unless the requirement to pay or perform shall be terminated pursuant to an express provision of this Lease. . . .

(Emphasis added.)

¶ 13. Wisconsin Mall also sought costs and attorney's fees from Saks. Section 6.2(a) of the lease provided that "Lessee shall pay all of Lessor's reasonable costs and expenses in connection with each such [condemnation] proceeding, action, negotiation, prosecution and adjustment."[6]

¶ 14. Wisconsin Mall rejected the City's jurisdictional offer of $5.7 million. Thus, pursuant to ch. 32, the City filed an award of compensation. The award was for the same sum of $5.7 million contained in the jurisdictional offer.

---

[6] The lease in section 5.4 also included a more general indemnification clause:

> Lessee shall defend all actions against Lessor . . . and shall pay, protect, indemnify and save harmless the Indemnified Parties from and against, any and all liabilities, losses, damages, costs, expenses (including, without limitation, reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature arising from any . . . damage to or loss of property, . . . [or] violation by Lessee of this Lease . . . .

¶ 15. Under the terms of the lease, Wisconsin Mall received all of the condemnation proceeds from the award of compensation. Specifically, the lease provided in section 6.2(a) that "Lessee hereby irrevocably assigns to Lessor any award, compensation or insurance payment to which Lessee may become entitled by reason of Lessee's interest in the Premises . . . if the use, occupancy or title of the Premises or any part thereof is taken . . . by or on account of any actual or threatened eminent domain proceeding . . . ."

¶ 16. In Wisconsin Mall's view, however, it had a shortfall. Wisconsin Mall viewed the terms of the lease as entitling it to at least $3.8 million more than what it received via the condemnation award, based on a provision in section 7.1(g) of the lease. This provision contained a formula for liquidated damages in the event of a default, as defined in the lease. The formula depended upon the amount of rent due over the remaining term of the lease and on a discount rate of five percent per year.[7]

---

[7] Section 7.1(g) of the lease reads as follows:

> At any time after any such expiration or termination of the Lease Term or reentry or repossession of the Premises or removal of persons or property therefrom by reason of the occurrence of an Event of Default, whether or not Lessor shall have collected any liquidated and agreed current damages pursuant to subsection 7.1(f), Lessor shall be entitled to recover from Lessee, and Lessee shall pay to Lessor on demand, as and for liquidated and agreed final damages for Lessee's default and in lieu of all liquidated and agreed current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (a) the aggregate of all Basic Rent, additional rent and other sums which would be payable under this Lease, in each case from the date of such demand (or, if it be earlier, the date to which Lessee shall have satisfied in full its obligations under subsection 7.1(f) to pay liquidated and agreed current damages) for what would be the

¶ 17. Saks moved for summary judgment on Wisconsin Mall's contract claim. The City, which had intervened in the action, also moved for summary judgment. Wisconsin Mall moved for partial summary judgment. Saks asserted that the effect of the condemnation was to transfer Wisconsin Mall's rights under the lease to the City. The City similarly argued that the only relief available to Wisconsin Mall was an appeal of the award of compensation in the condemnation proceedings. Wisconsin Mall argued that the condemnation had no effect on the parties' obligations under the lease.

¶ 18. The circuit court granted Saks' and the City's motions, and it denied Wisconsin Mall's motion. It ruled that the existence of the condemnation proceedings precluded Wisconsin Mall from maintaining its contract action against Saks. Wisconsin Mall appealed, and the court of appeals affirmed the circuit court. It concluded that Wisconsin Mall could not sustain a breach of contract claim under a condemned contract. In the view of both the circuit court and the court of appeals, Wisconsin Mall's remedies were confined to pursuing an adjustment to the award of compensation via the ch. 32 condemnation proceedings.

II

■■■■■

¶ 19. We review the grant or denial of summary judgment independently, using the same methodology as the circuit court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). If there is a

---

then unexpired Lease Term in the absence of such expiration, termination, reentry, repossession or removal, discounted at the rate of 5% per annum, over (b) the then fair rental value of the Premises, discounted at the rate of 5% per annum for the same period. . . .

genuine dispute as to one or more material facts, summary judgment should not be granted. *Tomlin v. State Farm Mut. Auto. Liab. Ins. Co.*, 95 Wis. 2d 215, 218–19, 290 N.W.2d 285 (1980); *see also* Wis. Stat. § 802.08(2).

## III

### A

¶ 20. Wisconsin Mall concedes that it is not entitled to a double recovery. In other words, all agree that Wisconsin Mall cannot recover for the same damages in both its contract action against Saks and the condemnation proceedings involving the City. Rather, the dispute in this case centers on whether Wisconsin Mall's only remedies for the damages it seeks must be had in the condemnation proceedings or whether Wisconsin Mall may seek a remedy against Saks via the contract action that is now before us.

¶ 21. Wisconsin Mall argues that its contractual remedies against Saks are not precluded by the condemnation of its property. It asserts that its contractual remedies against Saks survive under the express terms of the lease. Wisconsin Mall further argues that the condemnation proceedings will not provide it with an adequate remedy.

¶ 22. Saks and the City argue that Wisconsin Mall has no rights under the lease as a result of the condemnation.[8] This argument is largely based on an assertion that the City exercised its eminent domain power to

---

[8] Unless otherwise indicated, we have combined the arguments of Saks and the City because most of their arguments are substantially similar.

condemn not only the property but also the lease. According to Saks and the City, it is as if Wisconsin Mall assigned the lease to the City such that the City stepped into Wisconsin Mall's shoes. Further, Saks and the City argue that even if Saks breached the lease, the damages for that breach must be had in the condemnation proceedings as part of Wisconsin Mall's just compensation for the lease.

¶ 23. In addressing the parties' arguments, we start with the premise that at least some contract claims relating to condemned property may be maintained apart from and despite any related condemnation proceedings. This premise, if not already apparent, has been made clear today in *Sonday v. Dave Kohel Agency, Inc.,* 2006 WI 92, ¶ 22, 293 Wis. 2d 458, 718 N.W.2d 631. *See also Hastings Realty Corp. v. Texas Co.,* 28 Wis. 2d 305, 317, 137 N.W.2d 79 (1965); *Kilps v. Pawinski,* 27 Wis. 2d 467, 473, 134 N.W.2d 470 (1965).

¶ 24. The question thus becomes whether Wisconsin Mall's contract claim against Saks may be maintained apart from and despite the pending condemnation proceedings that relate to the Green Bay store property. In seeking to answer this question, we begin our analysis with two general rules of eminent domain and contract law, then turn to the terms of the parties' lease. We also reject arguments by Saks and the City that Wisconsin Mall's remedies in the condemnation proceedings will necessarily be adequate.

¶ 25. Based on the two general rules and the terms of the lease, we determine that whether Wisconsin Mall may seek a remedy against Saks via its contract claim will depend on the terms of the lease as interpreted and applied to the facts of this case. More specifically, it will depend on whether Saks in fact

breached the lease and on what damages would be due Wisconsin Mall under the lease for such a breach.

B

¶ 26. We begin with the two general rules: (1) complete condemnation of a property terminates a lease attached to that property; and (2) the parties to a lease may contract for their rights and obligations in the event of condemnation.

¶ 27. **General rule #1: Complete condemnation of a property terminates a lease attached to that property.** Leading authorities appear to agree that this is the general rule. According to *Nichols on Eminent Domain,* "[L]eases are terminated when all the leased property is taken." Julius L. Sackman, 4 *Nichols on Eminent Domain* § 12D.01[3][l][ii] (3d ed. 2005). Similarly, the Restatement provides: "If there is a taking by eminent domain of all of the leased property for all of the lease term, the lease is terminated." Restatement (2d) of Property § 8.1(1) (1977).[9] The comments to the Restatement explain that "[a] taking by eminent domain of all of the leased property for all of the term necessarily terminates the lease because there is no leased property left." Restatement (2d) of Property § 8.1, cmt. a (1977); *see also* Milton R. Friedman, 2 *Friedman on Leases,* § 13.1, at 784 (4th ed. 1997) ("Complete condemnation terminates a lease because there is nothing left from which the lease may hang.") (footnotes omitted).

---

[9] This court has previously cited favorably to the Restatement rule. *Maxey v. Redevelopment Auth.,* 94 Wis. 2d 375, 405, 288 N.W.2d 794 (1980) (quoting Restatement (2d) of Property (Tent. Draft No. 2) § 7.1(1)).

¶ 28. **General rule #2: The parties to a lease may contract for their rights and obligations in the event of a condemnation.** For example, a lessor and lessee have the right to contract with respect to how condemnation proceeds should be allocated between them. *See, e.g., Maxey v. Redevelopment Auth.,* 94 Wis. 2d 375, 400, 288 N.W.2d 794 (1980); Patrick J. Rohan & Melvin A. Reskin, 7A *Nichols on Eminent Domain* § 11.06[1][a] (3d ed. 2005).[10]

¶ 29. As another example, which implicates the first general rule we have cited, the Restatement explains that "parties may agree to continue the obligation of the tenant in [a taking by eminent domain of all of the leased property] to pay a money sum equivalent to the rent *but the lease itself cannot continue.*" Restatement (2d) of Property, § 8.1, cmt. a (emphasis added).

> Even though there is no subject matter left to which the lease could apply, *so that the lease could not continue, the parties could agree that the obligation of the tenant to pay a sum equal to the rent would continue.* An agreement otherwise as to the effect on a lease, or the continuation of obligations under the lease, of a taking by eminent domain is valid unless it is unconscionable.

*Id.,* cmt. e (emphasis added).

---

[10] According to *Nichols on Eminent Domain,* the law does not look with favor on clauses causing forfeiture of the tenant's interest upon condemnation, and a lease provision will thus be construed not to have this effect if it can be avoided under the circumstances. Patrick J. Rohan & Melvin A. Reskin, 7A *Nichols on Eminent Domain* § 11.06[2] (3d ed. 2005).

However, "by a properly drawn lease provision, a lessee may be barred from sharing in the proceeds." *Maxey,* 94 Wis. 2d at 401. Such was apparently the case here. The parties are not disputing the validity of the lease clause allocating all condemnation proceeds to Wisconsin Mall, thus we need not address it.

¶ 30. The ability of parties to a lease to contract for their respective rights and obligations upon condemnation is thus not limited to the two examples given. *Nichols on Eminent Domain* explains that "[m]ost conflicts that condemnation imposes on the landlord and tenant can be avoided by proper planning. In this regard, the most important tool is educated negotiation and drafting of the lease contract." 7A *Nichols on Eminent Domain* § 11.06[1][a].[11]

¶ 31. In light of these general rules, we make two observations. First, it is not correct to assume that the condemnation here operated as an assignment of the lease, placing the City directly into the shoes of Wisconsin Mall as the lessor under the lease. Rather, the condemnation of Wisconsin Mall's property terminated the lease, except to the extent that the parties agreed otherwise with respect to their rights and obligations in the event of a condemnation. Second, it is also not correct to assume, as do Saks and the City, that Wisconsin Mall is necessarily precluded from enforcing against Saks any right that arose under the lease.

¶ 32. Making the indicated assumptions on the facts of this case would seem to contravene at least one if not both of the general rules that we have cited. Here, such assumptions would not only suggest that the lease may have survived condemnation intact, with the City

---

[11] In fact, the *Nichols* treatise seems to suggest that the ability of lessor and lessee to contract for their rights and obligations in the event of condemnation may even supercede the general rule that complete condemnation of property necessarily terminates an attached lease. The treatise states in one section that "*[i]n the absence of a lease provision to the contrary,* it is generally held that condemnation terminates the lease as to the property condemned." 7A *Nichols on Eminent Domain,* 11.05[2] (emphasis added).

as the new lessor, but also would nullify the ability of lessor and lessee to contract for their rights and obligations in the event of condemnation.[12]

¶ 33. To this we add a third observation. Wisconsin Mall's contract claim against Saks appears primarily based on an alleged breach of the lease that occurred before its property was condemned. The primary breach that Wisconsin Mall alleges is of section 5.1(c) of the lease. Specifically, Wisconsin Mall asserts that Saks took actions to avoid the lease by colluding with the City to effectuate a condemnation that would allow Saks to escape its obligations to Wisconsin Mall under the lease.[13]

¶ 34. The termination of a lease would not ordinarily be expected to extinguish an existing cause of action for a breach of the lease. For example, suppose Landlord A rents premises to Tenant B for a term of one

---

[12] The court of appeals in this case observed that "[t]he fact pattern before us is novel" and considered this case "[u]nique[]" in that "the City condemned not only the property but also the lease, and the Mall attempted to pursue a breach of contract action under the condemned lease." *Wisconsin Mall,* 288 Wis.2d 463, ¶ 6. To the court of appeals' observations, we add that this case involves a lease in which the parties to that lease expressly contracted for their respective rights and obligations in the event of condemnation. Thus, we need not address situations in which the parties have not so contracted.

[13] Wisconsin Mall's arguments before this court ultimately focused on a breach of section 5.1(c) of the lease based on collusion. The complaint Wisconsin Mall filed, however, may be interpreted to encompass other pre-condemnation breaches. It incorporates the lease as an exhibit, sets forth several specific lease provisions, and includes a general allegation that "Defendants have breached the above-referenced Lease." Thus, Wisconsin Mall is not foreclosed on remand from asserting that there were other pre-condemnation breaches of the lease.

year, beginning January 1, 2007, with rent payable once per month. Tenant B then fails to pay rent for the month of December, and the lease terminates on December 31, 2007. Landlord A has a breach of the lease claim against Tenant B, and that claim would normally be expected to survive the December 31, 2007 termination of the lease, absent some express provision to the contrary.[14]

██

¶ 35. The lease here contained express provisions referring to the parties' rights and obligations in the event of a condemnation. For example, the lease contained a clause expressly providing that Wisconsin Mall would receive all of the condemnation proceeds from the award of compensation. It also contained a clause providing that Saks would pay all of Wisconsin Mall's reasonable costs and expenses in connection with a condemnation proceeding.

¶ 36. In addition, the lease contained other provisions which can at least arguably be interpreted as intended to control the parties' rights and obligations in the event of an anticipated or actual condemnation. These provisions include the provision prohibiting Saks from seeking to avoid the lease; the so-called "hell or high water" clause; the clause under which Saks agreed to indemnify Wisconsin Mall; and the liquidated damages clause based on the five percent discount rate.

¶ 37. Saks and the City nonetheless maintain that Wisconsin Mall can be fully compensated in condemnation proceedings under ch. 32 for any damages resulting

---

[14] Our focus in this case on a breach that occurred pre-condemnation is not intended to foreclose the possibility that there could be a post-condemnation breach of a lease. Rather, given the facts presented, we do not address the possibility of post-condemnation breaches of a lease in this opinion.

from an alleged breach of the lease. They assert that Wisconsin Mall has an adequate remedy available in the condemnation proceedings and that any damages Wisconsin Mall suffered as a result of the condemnation are compensable as just compensation under ch. 32. They cite cases which, in their view, support this assertion. *See, e.g., Herro v. DNR,* 67 Wis. 2d 407, 420, 227 N.W.2d 456 (1975) ("Every element which affects value and which would influence a prudent purchaser should be considered.").

¶ 38. We are not persuaded, however, that these cases ensure that the damages or other remedies available to Wisconsin Mall in a contract cause of action would necessarily be available in ch. 32 condemnation proceedings. At oral argument, at least two potential differences came into particularly sharp focus.[15]

¶ 39. First, if Wisconsin Mall is able to show that Saks breached the lease in a manner that entitled it to invoke section 7.1(g) of the lease, the five percent discount rate set forth in the lease to calculate the present value of future rent damages may or may not be available as part of Wisconsin Mall's just compensation in condemnation proceedings. When the City made the condemnation award to Wisconsin Mall, it apparently calculated the award assuming a higher discount rate of approximately 13 percent. According to Wisconsin Mall, if the lower five percent discount rate is applied to its contract damages against Saks, that would result in $3.8 million more than what it received in the condemnation award.

¶ 40. Neither Saks nor the City is willing to concede that Wisconsin Mall is entitled to the lease's

---

[15] In discussing these two potential differences, we do not mean to suggest that there may not also be other differences.

five percent discount rate as part of its just compensation in the ch. 32 condemnation proceedings even if Wisconsin Mall is able to show a breach that triggered that provision in the lease. At one point during oral argument, the City argued that each party to the condemnation proceedings would have an expert who could proffer an opinion as to the proper discount rate to apply, leaving the ultimate determination of the applicable rate to the jury.[16]

¶ 41. Second, the litigation expenses (including attorney's fees) available to Wisconsin Mall in this contract action against Saks may be different from what it could receive in the ch. 32 condemnation proceedings. As already noted, the lease contains a clause providing that Saks would pay all of Wisconsin Mall's reasonable costs and expenses in connection with the condemnation proceedings. It also contained a more general provision under which Saks agreed to indemnify Wisconsin Mall.

¶ 42. In contrast, express provisions in Wis. Stat. § 32.28 dictate that litigation expenses (including attorney's fees), are available to a condemnee only if certain conditions are met. For example, the condemnee is allowed litigation expenses if a jury verdict for the condemnee exceeds the jurisdictional offer or the highest written offer prior to the jurisdictional offer by at least $700 and at least 15 percent. *See* § 32.28(1) and (3)(e).

¶ 43. The court of appeals summarily determined that any attorney's fees due Wisconsin Mall under the lease could be considered in the amount of the condem-

---

[16] It is difficult to square this argument with Saks' and the City's argument that all the damages that Wisconsin Mall has suffered will necessarily be compensable in the condemnation proceedings.

nation award. However, this determination may present a conflict with the express provisions of § 32.28.

¶ 44. Based on these and other potential differences between the damages or other remedies that may be available to Wisconsin Mall in its contract claim against Saks and the damages or other remedies that may be available in ch. 32 condemnation proceedings, we reject Saks' and the City's argument that Wisconsin Mall's remedies must necessarily be had in condemnation court. Rather, in light of the two general rules we previously discussed and the terms of the lease, we remain convinced that whether Wisconsin Mall may seek a remedy against Saks for a breach of the lease depends on the terms of the lease as interpreted and applied to the facts of this case.

¶ 45. Whether Wisconsin Mall will ultimately be entitled to a remedy against Saks here will also depend on whether Saks breached the lease, and what damages exist as a result of such breach. When these questions are answered, it can be determined whether Wisconsin Mall is entitled to contract damages against Saks that exceed what it has received as just compensation under ch. 32. In other words, it can be determined whether Wisconsin Mall is confined to condemnation court, or whether it is ultimately entitled to a remedy against Saks in this contract action.

¶ 46. The circuit court erroneously granted summary judgment on the theory that the existence of condemnation proceedings precluded Wisconsin Mall from maintaining a breach of contract claim against Saks.[17] Thus, it did not address whether there exist any

---

[17] The circuit court's oral decision on summary judgment was brief. In addition to concluding that condemnation law "trumps" contracts, it also determined that Wisconsin Mall was precluded from asserting a breach of contract against Saks-

genuine issues of material fact with respect to the existence of a breach and to damages for such a breach.[18]

¶ 47. Accordingly, we reverse the court of appeals' decision that affirmed the circuit court, and we remand to the circuit court for further proceedings consistent with this opinion. Upon remand, the circuit court will

---

based on Saks' alleged collusion with the City because Wisconsin Mall failed to pursue a Wis. Stat. ch. 32 claim that the City's condemnation of its property was not for a public purpose.

We understand that Wisconsin Mall's contract claim against Saks may implicate the question of whether the City's condemnation of the property was for a public purpose. However, we do not agree that Wisconsin Mall was required to litigate the public purpose question in a ch. 32 proceeding in order to preserve its right to assert collusion by Saks in the breach of contract action before us.

[18] Wisconsin Mall asserts that the facts reveal that Saks induced the City to condemn Wisconsin Mall's property in violation of section 5.1(c) of the lease. It relies on evidence submitted as part of the summary judgment materials, including the retention agreement between Saks and the City under which the City indemnified Saks and Saks conferred certain benefits on the City. According to Wisconsin Mall, this agreement shows that Saks "paid" the city to condemn Wisconsin Mall's property. Wisconsin Mall further advances that an email message from its managing member indicated it was willing to be part of a "friendly" condemnation only if the terms of the lease remained in force.

Saks, in contrast, asserts that discussions regarding the acquisition of Wisconsin Mall's property were initiated by the City's mayor. It interprets the email from Wisconsin Mall's managing member differently to show that Wisconsin Mall was aware of the nature of the City's condemnation plans and was willing to go along with them. Saks also suggests that Wisconsin Mall continued to be involved in condemnation negotiations up to and including 2003, when the City made a jurisdictional offer. It points to deposition testimony of Wisconsin Mall's managing member, also included in the summary judgment materials.

be able to determine whether there exist genuine issues of material fact as to breach and damages.[19]

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

[19] It appears that the parties have agreed to stay the condemnation proceedings, Brown County Circuit Court Case No. 2005CV2218. During the time that Wisconsin Mall's contract action remains pending, condemnation proceedings should remain stayed.

The City asserts that, even in the condemnation proceedings, it should have the right to bring a motion in limine challenging section 7.1(g) of the lease as an unenforceable penalty clause. We need not address the question of whether such a challenge has merit. Rather, the City may attempt to bring its motion at the appropriate time.