STATE of Wisconsin, Plaintiff-Respondent,

v.

T. J. McQUAY, INC., Defendant,

SCS OF WISCONSIN, INC., Defendant-Appellant.†

Court of Appeals

*No. 2007AP2449. Submitted on briefs July 29, 2008.*
*—Decided November 25, 2008.*

2008 WI App 177

(Also reported in 763 N.W.2d 148.)

† Petition to review denied 2/10/09.

215

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John E. Machulak* of *Machulak, Robertson & Sodos, S.C.*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Steven E. Tinker*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. SCS of Wisconsin, Inc. (SCS) appeals from a judgment entered against it following a court trial. SCS makes the following arguments: the record does not support a number of the trial court's findings; it was not an "operator" within the meaning of Wis. Admin. Code ch. NR 447 (June 2004); the trial court erroneously exercised its discretion by imposing excessive statutory forfeitures; and the trial court erred in deciding that it was not entitled to a jury trial.[1] We conclude: the trial court's findings of fact are supported by the record; SCS was an "operator" within the meaning of the applicable regulations; the trial court appropriately exercised its discretion in imposing the

---

[1] All code provisions are current through Wisconsin Administrative Register No. 582, June 2004. Although the events giving rise to this litigation occurred prior to June 2004, the code provisions cited in this opinion have not changed.

forfeitures that it did; and because the causes of action asserted against SCS did not exist and were not known or recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848, SCS had no constitutional right to a jury trial. *See Village Food & Liquor Mart v. H & S Petroleum, Inc.*, 2002 WI 92, ¶ 11, 254 Wis. 2d 478, 647 N.W.2d 177. Accordingly, we affirm.

## I. BACKGROUND.

¶ 2. SCS contracted with Patrick Cudahy, Inc. (Cudahy) to perform demolition work on Buildings L and LX at the Cudahy facility. It began its demolition work in April 2004. SCS's contract with Cudahy specifically excluded all asbestos abatement work. To perform the asbestos abatement work, Cudahy entered into a separate contract with T.J. McQuay, Inc. (McQuay).

¶ 3. Saji Villoth, an asbestos specialist with the DNR at the time of the events that led to this lawsuit, testified that he conducted an inspection at the Cudahy site around 2:30 p.m. on May 17, 2004. Upon his arrival, Villoth saw that walls and sections of the roof on Building L of the Cudahy complex had been demolished. Villoth observed what he believed was asbestos-containing material, testifying, "[t]here was transite material scattered in almost every area of the demolition rubble." He recalled that the transite, which he defined as "either a flat sheet or a corrugated sheet of cementitious material that has columns of asbestos fiber in it," was broken into pieces the size of his hand and smaller. There were signs that the transite had been driven over by a Bobcat or crane. Villoth testified that no certified asbestos supervisors were present when he arrived at the site.

¶ 4. No McQuay crew members were present at the time of Villoth's inspection on May 17, 2004; however, SCS employees were working at the site.[2] According to Villoth, SCS's crane operator, Roy Kaisler, told him that the transite came from the fourth floor of Building L. Villoth testified regarding his conversation with Kaisler: "His [Kaisler's] words to me were that the roofing was unsafe and he had been directed to wreck the building with the roofing in place."

¶ 5. In his own testimony, Kaisler confirmed that because the roof was deteriorated, a McQuay employee asked him to "work that roof off and let the stuff drop down into this one room. Then they [McQuay] would go and clean it up." In response to the request, Kaisler used the crane, which had a bucket attached, and "went along and just sort of broke the boards up, got stuff to fall off the steel." McQuay's crew was on-site when this demolition occurred.

¶ 6. In the course of his inspection, Villoth looked in dumpsters on the site and found "[a] substantial amount of the bags were torn with pieces of transite sharp edges poking through the plastic material. [It l]ooked like the material, it was only single bagged. In a case like this, you try to double bag it to maximize the protection." Villoth did not see any signs of water on the bags. He explained that water is used to minimize any emissions of asbestos fibers into the outside air and its use is required by the regulations both prior to and after demolition.

---

[2] McQuay's crew had apparently concluded its work for the day. Craig Deutekowski, McQuay's supervisor for portions of the Cudahy job, was later called to the site to meet with Villoth on May 17, 2004. Deutekowski's name is spelled Dekutowski, Deutekowki, and Deutekowski at various spots in the record. We will refer to him as Deutekowski throughout this opinion.

¶ 7. Villoth testified that contrary to the applicable regulations, regulated asbestos-containing material [RACM] was not removed prior to the demolition work at the Cudahy site. According to Villoth, prior removal is important because RACM can be rendered friable during demolition activities. Villoth explained what it means when material is rendered friable:

Q. Tell us what friable means.

A. Friable—I'll step back to that.

The transite is classified as regulated asbestos[-]containing material. The definition of NR 447 defines it as any material that can be rendered friable by the demolition process; and to render [it] friable, it would have to be crushed, ground, sanded, abraded, which was what occurred to this material.

By itself, it is not friable. It can be rendered friable by demolition.

Q. So as it was hanging on the ceiling, it was not friable; but once it's knocked down and run over, it becomes friable?

A. Yes.

¶ 8. From the Cudahy site, Villoth took samples of what he suspected to be asbestos-containing material and submitted them to the State's Occupational Health Laboratory for testing. Testing determined that the samples contained 15% asbestos, which Villoth explained is significant because the regulations define asbestos-containing material as anything containing greater than 1% asbestos.

¶ 9. The State subsequently filed suit, alleging that SCS and McQuay did not comply with the administrative regulations in that they: failed to wet RACM;

failed to carefully lower RACM; failed to supervise during removal activities; failed to remove RACM before demolition; and failed to seal RACM in leak-tight containers.[3] The State sought forfeitures for McQuay's and SCS's violations under WIS. STAT. § 285.87(1) (2005–06), along with ancillary court fees and surcharges.[4]

¶ 10. McQuay did not file an answer, and the State obtained a default judgment against it in the amount of $33,912.50. SCS denied the State's allegations against it, argued that it was not responsible for the asbestos abatement work, and demanded a jury trial. The trial court granted the State's motion to strike SCS's demand for a jury trial based on its conclusion that SCS failed to show the action met either of the two prongs required by *Village Food. See id.*, 254 Wis. 2d 478, ¶ 11. Following a court trial, judgment was entered against SCS in the amount of $58,867.50, roughly $25,000 in excess of the amount of the default judgment against McQuay. SCS appeals. Additional facts are provided in the remainder of this opinion as needed.

## II. ANALYSIS.

### A. *The trial court's findings of fact are supported by the record.*

¶ 11. SCS contends that the record does not support a number of the trial court's findings of fact. It argues: (1) the State's laboratory proof and chain of custody do not establish that SCS violated any asbestos abatement regulations; and (2) the record does not

---

[3] The claims made in the complaint did not distinguish the two defendants.

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

support the trial court's findings as to the five causes of action asserted against SCS, which consisted of failure to wet, failure to carefully lower, failure to supervise, failure to remove before demolition, and failure to seal in leak-tight containers.

██

¶ 12. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). Under the clearly erroneous standard of review, "even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the same finding." *Reusch v. Roob*, 2000 WI App 76, ¶ 8, 234 Wis. 2d 270, 610 N.W.2d 168. We search the record for evidence to support the findings that the trial court made, and not to support findings that the trial court could have made but did not. *See Noble v. Noble*, 2005 WI App 227, ¶ 15, 287 Wis. 2d 699, 706 N.W.2d 166.

1. *Laboratory proof and chain of custody.*

¶ 13. SCS argues that the State's laboratory proof and chain of custody do not establish that SCS violated any of the asbestos abatement regulations. Specifically, SCS challenges whether the transite constituted RACM.

¶ 14. The trial court concluded that the transite was RACM as defined by WIS. ADMIN. CODE § NR 447.02(33)(d).[5] This section states:

---

[5] For reasons that are unclear, SCS cites the definition of "Nonfriable ACM" found in WIS. ADMIN. CODE § NR 447.02(27), which states in relevant part: " 'Nonfriable ACM' means any material containing more than 1% asbestos . . . that, when dry, cannot be crumbled, pulverized or reduced to powder by hand pressure." SCS argues: "The State's laboratory expert intro-

**(33)** "Regulated asbestos-containing material" or "RACM" means:

. . . .

(d) Category II nonfriable ACM that has a high probability of becoming or has become crumbled, pulverized or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations regulated by this chapter.

*Id.* "Category II nonfriable ACM" is specifically defined as "any material, excluding Category I nonfriable ACM, containing more than 1% asbestos . . . that, when dry, cannot be crumbled, pulverized or reduced to powder by hand pressure." Sec. NR 447.02(1)(b).

■

¶ 15. In support of its conclusion, the trial court found:

duced no evidence that any of the transite arising in the testimony [sic] could be reduced to powder by hand pressure. In fact the State's expert testified that he did not know whether the samples given to him could be pulverized by hand pressure."

As stated, the trial court concluded the transite was Category II nonfriable ACM, pursuant to Wis. Admin. Code § NR 447.02(33)(d), which means it "ha[d] a high probability of becoming or ha[d] become crumbled, pulverized or reduced to powder *by the forces expected to act on the material in the course of demolition or renovation operations* regulated by this chapter." (Emphasis added.) Category II nonfriable ACM is further defined as "any material, excluding Category I nonfriable ACM, containing more than 1% asbestos . . . that, when dry, *cannot be crumbled, pulverized or reduced to powder by hand pressure.*" Sec. NR 447.02(1)(b) (emphasis added). To the extent that SCS is arguing on appeal that a different definition applies, we deem the argument undeveloped and do not consider it further. *See W.H. Pugh Coal Co. v. State,* 157 Wis. 2d 620, 634, 460 N.W.2d 787 (Ct. App. 1990) (an appellate court may decline to consider an issue that is undeveloped in the briefs).

21. The pieces of transite observed in the demolition piles, vehicle paths and building were crumbled, having been crushed, pulverized, broken or shattered in the course of asbestos abatement and the demolition activity. The transite in the debris piles and vehicle tracks came from the fourth floor of Building L.

22. The transite which had been knocked down, broken, crushed, and run over had become friable. SCS demolition activity caused transite to fall greater than 50 linear feet from the fourth floor in Building L. Transite debris was crushed in the tracks of heavy equipment.

Villoth's testimony supports these findings. He observed transite commingled within brick piles, in the dirt, on the driveway that the crane was parked on, and "[t]here were signs of it having been driven over in the dirt by the [B]obcat or crane." He testified that the transite was broken into pieces the size of his hand and smaller.

¶ 16. SCS next argues that "[t]here is no laboratory proof that there was RACM in any rubble pile, or in any part of the building where SCS conducted demolition." The trial court found:

26. The method used to obtain samples of the transite, the testing procedures, the consistency of the samples with the transite paneling in the building, and the testimony of witnesses as to the source of the transite on the ground support the finding that the material in the rubble piles was RACM.

██

¶ 17. This finding is confirmed by Villoth's testimony detailing that he obtained samples from various spots: from tracks left by heavy equipment; from near a dumpster; and from the concrete pad behind the crane. Villoth testified that when he asked Kaisler where the transite came from, Kaisler told him that it was from the fourth floor of Building L. Testing later confirmed that

the samples contained greater than 1% asbestos. Although samples may not have been directly removed from a rubble pile, there is sufficient circumstantial evidence in the record—photographs, reports, and testimony—supporting the conclusion that the material in the rubble piles was RACM. *See* WIS JI—CIVIL 230 ("A fact may be proved indirectly by other facts or circumstances, from which it usually and reasonably follows according to human experience. This is called circumstantial evidence . . . . Direct evidence is not necessarily better or worse than circumstantial evidence. Either type of evidence can prove a fact.").

¶ 18. While SCS argues that "[t]he samples which Villoth sent to the laboratory were likely produced by McQuay's abatement work," as we discuss later in this opinion, *see* ¶¶ 44–49, *infra,* because SCS, like McQuay, was an operator within the meaning of the regulations, both were responsible for ensuring compliance. Consequently, it is irrelevant which entity was responsible for producing the samples.

¶ 19. We are similarly not persuaded by SCS's contention that the chain of custody was insufficiently established. On this issue, the trial court found:

> 24. On May 17, 2004, Villoth took samples of pieces of transite from the site and submitted five to the Wisconsin Occupational Health Laboratory (Laboratory) for analysis. Villoth's testimony and Exhibit 1 describe the location of the samples taken and Exhibit 6 sets forth the chain of custody.

¶ 20. The trial testimony of Villoth and John Knight, the asbestos analyst at the Occupational Health Laboratory who tested the samples, substantiate this finding. As such, we conclude there was ad-

228

equate evidence before the trial court to establish the chain of custody requirements under Wɪꜱ. Sᴛᴀᴛ. § 909.01, which states: "The requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See generally State v. McCoy*, 2007 WI App 15, ¶ 9, 298 Wis. 2d 523, 728 N.W.2d 54 ("A perfect chain of custody is not required.").

2. *The State's five causes of action.*

a. Failure to wet.

¶ 21. SCS challenges the findings made by the trial court in support of its conclusion that SCS violated Wɪꜱ. Aᴅᴍɪɴ. Cᴏᴅᴇ § NR 447.08(6)(a). Section NR 447.08(6)(a) requires that each owner or operator of a demolition or renovation activity to whom its terms apply comply with the following: "**(6)** For all RACM, including material that has been removed or stripped: (a) Adequately wet the material and ensure that it remains wet until collected and contained or treated in preparation for disposal in accordance with s. NR 447.13."

¶ 22. The trial court found:

> 23. On the job site there were commingled brick-transite piles. SCS crew cleaned for recycling three pallets of brick without evident use of water, respiratory protection or prevention of damage to transite.

Instead of arguing that this finding is clearly erroneous, SCS reiterates its contention that there was no evidence that the material in the rubble piles was RACM. We have already concluded that argument is without merit. As a result, this argument also fails.

229

b. Failure to carefully lower.

¶ 23. SCS also challenges the underlying factual findings supporting the trial court's conclusion that it violated Wis. Admin. Code § NR 447.08(6)(b). Section NR 447.08(6)(b) mandates compliance with the following procedure: "**(6)** For all RACM, including material that has been removed or stripped: . . . (b) Carefully lower the material to the ground and floor, not dropping, throwing, sliding or otherwise damaging or disturbing the material."

¶ 24. In support of its conclusion, the trial court made the following finding of fact:

> 34. Kaisler, an SCS employee, operated the crane to impact the roof causing the transite panels to fall four floors or approximately 50 feet to the floor and ground. No demolition had taken place on that section of the building prior to that time.

This finding is supported by the trial testimony of Deutekowski, McQuay's supervisor at the Cudahy site, who observed the fourth floor roof of the L building on the Cudahy site, which contained transite, being knocked down by a crane operated by Kaisler. Deutekowski testified that he saw the transite fall to the floor, which resulted in some of the transite panels breaking into pieces. Deutekowski stated: "I believe the ceilings were around 30 feet, maybe 40 feet. I don't recall how high the ceilings were, but they were pretty high up there."

¶ 25. Villoth testified that based on what he had been told by Kaisler, the demolition activity caused the RACM to fall approximately fifty feet. Villoth acknowledged that his estimate in this regard was based on standing outside of the building and estimating each floor to be approximately fifteen feet high.

¶ 26. In light of this testimony, SCS's contention that "[t]he trial court's findings ignore the testimony offered by every eyewitness as to the manner in which Kaisler assisted McQuay in reaching and removing potential asbestos from the southeast corner of the building, including the witness called by the State, Craig Deutekowski," is unfounded. To the contrary, we conclude that the trial court assessed the credibility of the witnesses and made findings of fact that are supported by the record.

¶ 27. SCS goes on to argue that the trial court wrongly implied that special notice to the DNR was required with the following finding of fact:

> 39. There is no credible evidence that [the] DNR gave prior oral approval to SCS or McQuay. [Mark] Davis[, the Asbestos Program Coordinator with the DNR and the Bureau of Air Management,] testified that he did not give oral approval to demolish the building and that he would not have approved [it] because the procedure used by SCS was not in compliance with the Wisconsin Administrative Code. His testimony was credible.

According to SCS, no special notice was required (other than that which is required prior to any demolition job, *see* WIS. ADMIN. CODE § NR 447.07), and the abatement contractor was allowed to make a "judgment call" under WIS. ADMIN. CODE § NR 447.08.

¶ 28. Prior to its finding of fact number 39, the trial court found:

> 38. The Wisconsin Administrative Code does include regulations relevant to the evaluation of safety concerns. If there is a concern, such as alleged here, that a roof is unsafe, then the operator *could* proceed

231

under Wis. Admin. Code § NR 447.06(2). Once a building inspector or structural engineer documents the safety concern, [the] DNR and contractors would determine the proper procedure to bring down the roof, with the transite in place, with the least amount of damage and exposure to the asbestos. No such request was made by SCS or McQuay. SCS took no steps to determine whether there was DNR approval for such demolition.

(Emphasis added.) When read in context, the trial court did not imply that special notice was required in its findings. Instead, the trial court found that when safety concerns arise in contexts such as the one at issue here, the regulations provide a mechanism that an operator "could" proceed under to consult with the DNR on this issue. See § NR 447.06(2)(c).[6] The trial court found that this did not take place and SCS does not argue otherwise.

### c. Failure to supervise.

¶ 29. SCS next contends that trial court's factual findings are insufficient to support its conclusion that

---

[6] WISCONSIN ADMIN. CODE § NR 447.06(2)(c) provides:

The requirements of ss. NR 447.07 and 447.08 apply to each owner or operator of a demolition or renovation activity, including the removal of RACM as follows:

. . . .

(c) If the facility is being demolished under an order of a state or local government agency, issued because the facility is structurally unsound and in danger of imminent collapse, only the requirements of ss. NR 447.07 (1), (2), (3) (c), (4) (a) to (g) and (i) to (q) and 447.08 (4) to (9) apply.

As the State points out, although a demolition order obtained pursuant to WIS. ADMIN. CODE § NR 447.06(2)(c) would have relieved SCS of some of the requirements under the regulations, it would not have exempted it from the require-

SCS violated Wis. Admin. Code § NR 447.08(8). Section NR 447.08(8) provides:

> No RACM may be stripped, removed or otherwise handled or disturbed at a facility regulated by this chapter unless at least one on-site representative, such as a foreman or management-level person or other authorized repre- sentative, trained in the provisions of this chapter and the means of complying with them, is present.

¶ 30. SCS argues that the following finding by the trial court is not supported by the record:

> 41. On May 17, 2004, none of the SCS employees on site were certified by the Wisconsin Department of Health and Family Services as asbestos abatement supervisors or workers and none had been trained in proper asbestos abatement or removal methods. Nor were any asbestos certified or trained workers on site during the roof demolition.[7]

(Footnote added.) According to SCS, this finding relates to when Villoth arrived at the site on May 17, 2004,

---

ment that RACM be carefully lowered pursuant to Wis. Admin. Code § NR 447.08(6)(b).

[7] Deutekowski, a trained supervisor, and others of McQuay's crew, were apparently present during the roof demolition. Mark Davis, the Asbestos Program Coordinator with the DNR and the Bureau of Air Management, testified that if there was one trained person on the site, that is sufficient to satisfy Wis. Admin. Code § NR 447.08(8). According to him, Cudahy, McQuay, and SCS did not each have to have its own supervisor. Without deciding the import of Davis's interpretation of an administrative regulation, even if we were to conclude the last sentence of the trial court's finding is not supported by the record, that portion is not pivotal to SCS's argument As we discuss, the record supports the finding that SCS employees engaged in activity that dis- turbed RACM without the requisite supervision.

"which by all accounts, was sometime after 2:30 p.m. At that time, McQuay had already finished its day, and SCS was not performing any asbestos abatement."

¶ 31. As clearly stated by its terms, WIS. ADMIN. CODE § NR 447.08(8) applies not just when asbestos abatement is underway, but also when RACM is being "stripped, removed or otherwise handled or disturbed at a facility." In this regard, the trial court found:

> 40. The broken transite pieces at the demolition site were not contained and were not kept wetted. On May 17, 2004, Villoth observed pieces of transite scattered in the rubble piles; the area was dusty and no water was present on the site. Dekutowski [sic] testified that when he arrived on May 17, 2004, the transite had not been kept wet. SCS employees were working in the transite contaminated rubble, segregating bricks and metal without any water, and other workers were driving over transite RACM. This activity disturbed asbestos-containing material.
>
> . . . .
>
> 43. On May 17, 2004, Villoth observed SCS employees disturbing RACM at the site by working in the debris piles that contained transite and driving over the transite with a [B]obcat.

¶ 32. We disagree with SCS that WIS. ADMIN. CODE § NR 447.08(8) "has its focus on having a trained supervisor present during the actual abatement work," and that as a result, the fact that Kaisler could have run over pieces of transite in the area around the building amounts to an "unreasonable interpretation" of the regulation. As stated, the application of § NR 447.08 is not limited to asbestos abatement work. It includes situations where RACM is disturbed. We conclude that, contrary to SCS's contention that "SCS employees were

<br>

not engaged in activities which required an NR 447 trained supervisor," the testimony of Villoth supports the findings that SCS employees engaged in such activity without the requisite supervision.

 d. Failure to remove before demolition.

¶ 33. SCS challenges the findings of fact that led the trial court to conclude that SCS violated WIS. ADMIN. CODE § NR 447.08(1). Section NR 447.08(1) requires that each owner or operator of a demolition or renovation activity to whom its terms apply comply with the following: "(1) Remove all RACM from a facility being demolished or renovated before any activity begins that would break up, dislodge or similarly disturb the material or preclude access to the material for subsequent removal," subject to certain exceptions.

¶ 34. According to SCS, the following finding by the trial court is not supported by the record:

> 42. The Wisconsin Administrative Code, Ch. NR 447 requires that any regulated asbestos-containing material (RACM) be removed before a site is demolished. Demolition of Building L began before all of the transite panels and broken pieces of transite had been removed from the area where the demolition was to occur.

¶ 35. SCS writes in its reply brief that, "[n]o witness testified that SCS demolished areas of the building with known potential transite in place, except for the roof section made the subject of the State's second cause of action[, i.e., failure to carefully lower]." This concession alone is enough to support the trial court's finding that "[d]emolition of Building L began before all of the transite panels and broken pieces of transite had been removed from the area where the demolition was to occur."

¶ 36. Moreover, Villoth testified to the presence of transite in the demolition area:

There was transite material scattered in almost every area of the demolition rubble.

In the dirt between the building and the snow fence where tracks of heavy equipment could be seen, there were pieces of transite that had been driven over, looked like the [B]obcat was moving around, had been crushed in several places.

Villoth said that Kaisler told him the transite was from the fourth floor of Building L. Kaisler told Villoth that because the roof was unsafe, he had been directed to demolish it with the transite in place and that the McQuay crew would then pick it up from the rubble pile. This testimony formed the basis for the trial court's finding:

17. Villoth spoke with Kaisler to ask about the transite in the demolition rubble and was told that it came from the transite panels which were located on the ceiling of the fourth floor. Kaisler told Villoth that McQuay had directed SCS to demolish the building with the transite in place and McQuay's crew would then pick up the transite debris.

██

¶ 37. SCS goes on to cite testimony of Villoth and Davis that demolition can take place around transite so long as the demolition activity is not disturbing the material, and further contends that McQuay had not finished its work at the site when it was inspected by Davis. SCS argues that Wis. Admin. Code § NR 447.08(1) "does not prohibit any demolition before complete removal of transite from the entire building." While this may be true, § NR 447.08(1) does require the "[r]emov[al] [of] all RACM from a facility being demolished or

236

renovated *before any activity begins that would break up, dislodge or similarly disturb the material* or preclude access to the material for subsequent removal." (Emphasis added.) There is sufficient evidence in the record to support the trial court's findings that this did not happen.

e. Failure to seal in leak-tight containers.

¶ 38. In addition, SCS maintains that the trial court's findings, which led it to conclude that SCS violated Wis. Admin. Code § NR 447.13(1)(a)3., are not supported by the record. Pursuant to § NR 447.13(1)(a)3., owners or operators covered by its terms are required to comply with the following:

(1) Discharge no visible emissions to the outside air during the collection, processing (including incineration), packaging or transporting of any asbestos-containing waste material generated by the source, or use one of the emission control and waste treatment methods specified in pars. (a) to (d).

(a) Adequately wet asbestos-containing waste material as follows:

. . . .

3. After wetting, seal all asbestos-containing waste material in leak-tight containers while wet; or, for materials that will not fit into containers without additional breaking, put materials into leak-tight wrapping.

¶ 39. SCS contends that two of the trial court's underlying factual findings are not supported by the record. The disputed findings read:

45. RACM must be placed in leak-tight containers once it is removed in order to prevent asbestos emis-

237

sions to the outside air. While some transite had been bagged and placed in dumpsters, the bags were torn leaving the asbestos exposed. The material was single, not double bagged. There was loose transite at the bottom of the dumpster.

. . . .

47. On May 17, 18, and 25, 2004, there were pieces of transite that had been stripped from facility components left laying around the facility without having been placed in sealed leak-tight containers.

¶ 40. SCS argues "[t]he evidence failed to establish that SCS was engaged in processing, packaging or transporting asbestos-containing waste material (this function being performed by McQuay) had anything to do with these dumpsters, or otherwise violated NR 447.13." (Parenthetical in brief.) The record belies this argument. First, as discussed in ¶¶ 44–49, *infra,* because SCS was an operator within the meaning of the regulations, like McQuay, it was responsible for ensuring compliance with Wis. Admin. Code § NR 447.13(1)(a)3.

¶ 41. Moreover, contrary to SCS's contention, it was directly involved in transporting asbestos-containing waste material. Deutekowski testified that while McQuay's employees collected the asbestos, it would have been lowered into the dumpster by SCS's crane operator. During cross-examination by SCS's attorney, he stated:

Q. Was that a fault of McQuay that those bags were split open?

A. I don't know whose fault it was.

We usually got bags off of the floor through SCS's crane. He would lower them down into our dumpster.

Whether they ripped coming out of the crane into the dumpster when he lowered them in there, I don't know.

¶ 42. Although Kaisler denied actually placing bags of asbestos into the dumpster, he confirmed that he lowered the bags:

Q. There was some testimony in the trial that you assisted in bringing down bags of asbestos from the top floor of the building. Did you do that?

A. Yes.

Q. How often did you do that?

A. I can't say a number, but quite a few times.

Q. Okay.

Could you describe to the Court what would happen in those instances?

A. I have my clam bucket. I close it up. I stick it into the edge of the building.

They [McQuay employees] would take these bags which they would fit in, a bushel basket size, but they were that asbestos.

That tile is really heavy, and they would load the bucket up. I would bring it down.

They had two guys down by the dumpster, and they would take it out of the bucket and put it in the dumpster.

Q. So I understand that clearly, you, yourself, didn't put it in the dumpster. They unloaded it –

A. Yes.

Q. –your bucket.

239

¶ 43. As for the scattered pieces of transite left around the site, SCS argues, in essence, that there is no proof that scattered pieces were RACM. We previously came to a contrary conclusion. *See* ¶¶ 13–20, *supra*. In addition, we are not persuaded by SCS's argument that pictures of the broken bags "failed to show that the entire dumpster would be sealed," which is another way to comply with WIS. ADMIN. CODE § NR 447.13(1)(a)3. The record is unclear regarding when the sealing that SCS references was going to occur. In contrast, there is clear support in the record for the trial court's findings that bags were torn, leaving asbestos exposed, and that pieces of transite were left around the facility without being placed in leak-tight containers. Accordingly, those findings will not be disturbed.

*B. SCS was an "operator" within the meaning of WIS. ADMIN. CODE § NR 447.02(30).*

¶ 44. SCS argues that the trial court improperly interpreted WIS. ADMIN. CODE § NR 447.02(30) when it held that SCS was an "operator" with the meaning of its terms. Section NR 447.02(30) provides: " 'Owner or operator of a demolition or renovation activity' means any person who owns, leases, operates, controls or supervises the facility being demolished or renovated or any person who owns, leases, operates, controls or supervises the demolition or renovation operation, or both."

¶ 45. Interpretation of an administrative regulation is a question of law subject to this court's independent review. *State v. Brown*, 2006 WI 131, ¶ 18, 298 Wis. 2d 37, 725 N.W.2d 262. We rely on principles of

240

statutory construction. *See Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶ 18 & n.17, 290 Wis. 2d 421, 714 N.W.2d 130. Because we interpret statutes as they are written, giving unambiguous language its clear meaning, the same is true of our interpretation of the administrative regulations at issue here. *See Rechsteiner v. Hazelden*, 2008 WI 97, ¶ 29 n.5, 313 Wis. 2d 542, 753 N.W.2d 496 (" 'The primary source of statutory construction is the language of the statute itself, and rules of construction are used only to determine the meaning of an ambiguous statute.' Thus, the court will interpret the statute as written." (citations omitted)).

¶ 46. SCS does not deny that it operated, controlled, or supervised demolition activity at the Cudahy site. Instead, SCS argues that because it did not contract to perform any asbestos abatement, it should not be deemed an operator under WIS. ADMIN. CODE § NR 447.02(30). However, that SCS was not the asbestos abatement contractor originally hired to perform that work is irrelevant to our consideration of this issue. Our focus is on the work that SCS actually performed at the Cudahy site. In this regard, the trial court found:

> SCS operated, controlled and supervised the demolition activities at Building L and LX. Ronald Retzer, Jr. (Retzer)[, co-owner of SCS,] testified that SCS operated, controlled and supervised the demolition operation, except for the asbestos abatement. Ray Marsh of Patrick Cudahy, Roy Kaisler of SCS and Craig Dekutowski [sic] with McQuay testified that the demolition operation was controlled by SCS. In addition, during the period of time within which the alleged violations were observed, SCS was listed as the demolition contractor for this project in the notification of demolition filed with the DNR.

¶ 47. SCS does not challenge these findings, which make clear that it falls within the definition of an operator provided in WIS. ADMIN. CODE § NR 447.02(30). As such, SCS was obligated to comply with the applicable regulations. *See State v. Harenda Enters., Inc.*, 2008 WI 16, ¶ 69, 307 Wis. 2d 604, 746 N.W.2d 25 (explaining that where a defendant is deemed an operator under the asbestos abatement regulations, strict liability for violations will ensue " 'regardless of how minimal the company's responsibilities or knowledge may actually have been' " (citation omitted)).

¶ 48. SCS argues "that the regulations at issue should be interpreted in a manner that permits a reasonable assignment of responsibility for the abatement work among Patrick Cudahy, McQuay, and SCS." This position, as SCS acknowledges, is contrary to the language of the regulations, which make clear that their terms apply to "[e]ach owner or operator." *See, e.g.*, WIS. ADMIN. CODE § NR 447.07 ("Each owner or operator of a demolition or renovation activity to which this chapter applies shall . . . ."); WIS. ADMIN. CODE § NR 447.08 ("Each owner or operator of a demolition or renovation activity to whom this section applies, according to [WIS. ADMIN. CODE §] NR 447.06, shall comply with the following procedures . . . ."); WIS. ADMIN. CODE § NR 447.13 ("Each owner or operator of any source covered under the provisions of [WIS. ADMIN. CODE §§] NR 447.05 to 447.10 shall comply with the following . . . .").

¶ 49. Despite the language in the regulations to the contrary, SCS relies on statements made by DNR representatives during trial to argue that it was not its responsibility to ensure compliance with the regula-

tions at issue. According to SCS, the testimony reflects that "[i]n practice, responsibility is assigned to one of the parties [for any given project], and the words 'each owner or operator' are interpreted to mean one or the other of them." We are not persuaded by this argument, which is contrary to the clear and unambiguous language of the regulations. Instead, we interpret the regulations as they are written and conclude that SCS was an "operator" within the meaning of WIS. ADMIN. CODE § NR 447.02(30).

C. *The trial court appropriately exercised its discretion in imposing forfeitures against SCS.*

¶ 50. According to SCS, the trial court erroneously exercised its discretion in assessing a penalty against it that almost doubled the penalty imposed against Mc-Quay. "[I]n assessing a forfeiture, a trial court must exercise its discretion within the mandatory statutory range." *State v. Schmitt*, 145 Wis. 2d 724, 730, 429 N.W.2d 518 (Ct. App. 1988). A trial court is permitted to use the limits provided to determine an appropriate forfeiture based on the facts of the individual case. *See State v. Chrysler Outboard Corp.*, 219 Wis. 2d 130, 174, 580 N.W.2d 203 (1998). "We will sustain a discretionary act if the trial court examined the relevant facts, applied a proper view of the law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Schmitt*, 145 Wis. 2d at 729.

¶ 51. The statutory range involved here is set forth in WIS. STAT. § 285.87(1):

(1) Except as provided in s. 285.57 (5) or 285.59 (8), any person who violates this chapter or any rule promul-

gated, any permit issued or any special order issued under this chapter shall forfeit not less than $10 or more than $25,000 for each violation. Each day of continued violation is a separate offense.

The trial court found SCS liable for committing five separate violations of WIS. ADMIN. CODE ch. NR 447. Along with statutory surcharges, the trial court imposed the following forfeitures: failure to wet, $3000; failure to carefully lower, $15,000; failure to supervise, $7000; failure to remove before demolition, $15,000; and failure to seal in leak-tight containers, $3000.

■■

¶ 52. As SCS points out, in determining civil forfeitures, the trial court can consider, among other matters, its cooperation in remediation, its initiation of remedial activities, the environmental harm caused, and the degree of its culpability. *See Chrysler Outboard Corp.*, 219 Wis. 2d at 174–75. Here, the trial court considered these factors and others:

The factors to consider include the environmental harm caused, the degree of the defendant's culpability, the defendant's cooperation, any economic benefit to the defendant, deterrents [sic], protecting the public and ensuring compliance.

On environmental harm, the conduct of the [d]efendant exposed workers to asbestos. And it wasn't just a general harm because here, there were workers actually on-site, and there were other workers at an adjacent site, and there were workers who used a common road near the site.

There was also evidence that some asbestos fell into areas of the building that were not demolished and buildings where people are working with that material, so by failing to properly handle the materials and not wetting it and not sealing it increased that exposure.

The most serious part was the knocking down the material when the demolition began before the asbestos was properly removed; and so that would be, I agree, it's [counts] two and four, the failure to carefully lower [and failure to remove before demolition]. But the starting of the demolition before the materials were removed I think is the serious part.

¶ 53. In terms of culpability, the trial court considered SCS's role at the site and held that "[t]hey [SCS] may not have had the contractual obligation to remove the asbestos, but they certainly had an obligation to not proceed in the face of it and they could have and should have stopped." As a "plus factor," however, the trial court recognized SCS's cooperation and prompt response to the situation.

¶ 54. The trial court commented on the economic benefit to SCS by proceeding with the demolition as opposed to ceasing work and waiting for DNR approval. With respect to deterrence, the trial court took into account prior violations by SCS in determining the penalty to impose, noting that a previous forfeiture had been insufficient to deter conduct in violation of the regulations.[8] The trial court sought to protect the public from asbestos exposure and to ensure compliance by sending a message that such conduct "is not to be tolerated."

¶ 55. SCS argues that the trial court's statements related to the environmental harm that was caused by this incident, the economic benefits related to the work,

---

[8] In its findings of fact, the trial court made clear that evidence of SCS's prior violations was inadmissible as other acts evidence and was not considered by the trial court in making its findings of fact with respect to liability. In imposing forfeitures, however, the court deemed the evidence relevant insofar as SCS

the protection of the public, and deterrence are more properly applied to McQuay because McQuay was the entity hired to perform the asbestos abatement. The trial court was not persuaded by this argument, holding that "under the law, [SCS has] a responsibility when they're engaged in activities where asbestos is present. That makes sense even though one doesn't have the contractual obligation as [a] demolition or construction person, they have to have some responsibility when working with asbestos . . . ." We agree and conclude that the trial court examined the relevant facts, applied an appropriate legal standard, and reached a reasonable result in imposing forfeitures against SCS.[9] Consequently, we will not disturb its discretionary ruling. *See Schmitt*, 145 Wis. 2d at 729.

## D. *SCS was not entitled to a jury trial.*

¶ 56. SCS maintains that four of the five causes of action asserted against it should have been tried to a jury because they are analogous to common law nui-

---

could not "be heard to say it was not aware that such conduct was a violation" when there was a substantially similar prior instance.

[9] In an effort to support its argument that the trial court erroneously exercised its discretion by imposing an "excessive" statutory penalty, SCS references a remark by the trial court to the effect that "it's only speculation to say why they [Cudahy] weren't prosecuted." According to SCS, this remark "does not ring true, given that the court excluded evidence which SCS had tried to offer on this topic as being irrelevant. The sad unspoken truth is that a small company like SCS does not get the same treatment as a Patrick Cudahy." SCS has not appealed the trial court's decision related to the evidence it references. Likewise, any issue related to the non-prosecution of Cudahy in this matter is not properly before us on appeal.

sance claims.[10] It argues that it satisfies the criteria establishing a constitutional right to a jury trial as set forth in *Village Food*, 254 Wis. 2d 478, ¶ 11. As a result, it contends that the trial court erred when it granted the State's motion to strike SCS's demand for jury trial. We disagree based on our determination that the causes of action asserted against SCS are not sufficiently analogous to common law nuisance claims to satisfy the first prong of the *Village Food* test.

¶ 57. The right to a jury trial in a civil case arises under article I, section 5 of the Wisconsin Constitution, which states in relevant part: "The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law." *See State v. Schweda*, 2007 WI 100, ¶ 17, 303 Wis. 2d 353, 736 N.W.2d 49 (explaining that article I, section 5 "has been interpreted to apply only to civil cases"). Although this section "provides that the right 'shall remain inviolate,' it does not apply to all matters." *Id.* Rather, the right to a jury trial today hinges on whether it existed at the time of the adoption of Wisconsin's constitution in 1848. *Id.*, ¶ 18 ("Moreover, Section 5 has been interpreted to mean that the right is preserved to the extent that it existed at the time of the adoption of the state constitution in 1848.").

¶ 58. On review, we independently determine whether SCS has a constitutionally guaranteed right to a jury trial for the causes of action asserted against it. *See Village Food*, 254 Wis. 2d 478, ¶ 7 ("Whether there

---

[10] SCS concedes that it is not entitled to have a jury trial on the State's third cause of action, which alleged that SCS failed to have a trained supervisor present.

is a constitutionally guaranteed right to a jury trial for a particular cause of action requires us to interpret a provision of the state constitution, which we do independently."). The test for determining whether SCS was entitled to have the claims against it tried to a jury is set forth in *Village Food* and provides that a constitutional right to a jury exists when: "(1) the cause of action created by the statute existed, was known, or was recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848 and (2) the action was regarded at law in 1848." *Id.*, ¶ 11. If either prong fails, there is no guarantee to the constitutional right to a jury. *See id.*, ¶ 17.

¶ 59. The easiest way to resolve this issue is to determine whether the causes of action created by the regulations "existed, w[ere] known, or w[ere] recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848." *See id.*, ¶ 11; *see also Dane County v. McGrew*, 2005 WI 130, ¶ 19, 285 Wis. 2d 519, 699 N.W.2d 890. SCS argues that four of the five causes of action asserted against it are analogous to common law nuisance claims.

¶ 60. In *Schweda*, our supreme court held that there was no right to a jury trial in an action alleging violations of waste disposal regulations because the claims asserted were not sufficiently analogous to common law nuisance causes of action to satisfy the first prong of the *Village Food* test. *Schweda*, 303 Wis. 2d 353, ¶ 3. In explaining its approach to the issue, the court stated that it "has been univocal in rejecting the temptation to carve out a constitutional right to a jury trial based on broad analogies between modern causes of action and causes of action at statehood." *Id.*, ¶ 21.

¶ 61. The *Schweda* court acknowledged: "There is no question that modern environmental law finds its

248

roots in common law nuisance." *Id.*, ¶ 31. It then went on to articulate the "vital differences between nuisance law and modern environmental regulatory law." *Id.*, ¶ 32. The court concluded: "Having 'doctrinal roots' in nuisance is not alone sufficient for a modern cause of action to be 'essentially a counterpart' to nuisance actions." *Id.*, ¶ 34; *see Village Food*, 254 Wis. 2d 478, ¶ 28 (concluding that the type of unfair trade practice that existed at common law and the unfair trade practice prohibited under the Unfair Sales Act "are essentially 'counterpart[s]' in combating unfair trade practices" (citation omitted)). Rather, to meet the first prong of the test "the modern cause of action requires more than a passing resemblance to the [common law] action." *Schweda*, 303 Wis. 2d 353, ¶ 34.

¶ 62. Despite its holding, *Schweda* left open the possibility that the right to a jury trial might exist in some cases where there are alleged violations of environmental regulations:

> Our determination, however, does not preclude the constitutional right to a jury trial in all environmental regulatory cases. Such a right exists if the asserted claim has an essential counterpart that existed at common law in 1848 and was recognized as an action at law in 1848.

*Id.*, ¶ 4 (citing *Village Food*, 254 Wis. 2d 478, ¶ 16). Relying on this language, SCS concludes that its right to a jury trial is not foreclosed by *Schweda*. We disagree.

¶ 63. Environmental regulation of asbestos has no counterpart in the common law of public nuisance. In *Schweda*, the court explained: "A cause of action for public nuisance requires a showing of substantial and unreasonable harm to interests in the use and enjoyment of land." *Id.*, ¶ 35. In contrast, "[v]iolations of the regulations [found in WIS. ADMIN. CODE ch. NR

447] are strict liability offenses." *Harenda Enters., Inc.,* 307 Wis. 2d 604, ¶ 9. Governmental specifications of environmental asbestos hazards are specific statutory and regulatory enlargements of governmental power unknown at the common law. *See generally id.,* ¶¶ 5–9 (explaining the framework underlying Wisconsin's asbestos regulations, which followed national emission standards related to asbestos originating in the 1970s).

¶ 64. According to SCS, however, "allegations that [it] dropped and pulverized dry transite, disbursing asbestos into the environment, appear to have this element of direct harm described by the court in *Schweda.*" In addition, SCS points to various statements made by the trial court referencing the harm that resulted. These statements do not establish that the violations of the asbestos regulations are akin to common law public nuisance claims. "[T]he appropriate question is whether the cause of action is contingent upon allegations of harm. Whether a defendant has a right to a jury trial should not depend upon whether the plaintiff alleges harms that are not necessary for the cause of action to lie." *Schweda,* 303 Wis. 2d 353, ¶ 36 n.7.

¶ 65. The causes of action SCS likens to common law public nuisance actions are as follows:

- Claim 1 alleges that SCS violated Wis. Admin. Code § NR 447.08(6)(a) "because RACM was disturbed at the site and it was not sufficiently wetted and no steps were taken to ensure that the resultant RACM remained wet until it was collected and contained or treated in preparation for disposal."

- Claim 2 alleges that SCS violated Wis. Admin. Code § NR 447.08(6)(b) "in that the defendants failed to carefully lower RACM to the ground or floor, not

dropping, throwing, sliding or otherwise damaging or disturbing the material."

- Claim 4 alleges that SCS violated Wis. ADMIN. CODE § NR 447.08(1) "in that the defendants failed to remove RACM from the facility prior to activity that broke up, dislodged or similarly disturbed the material."

- Claim 5 alleges that SCS violated Wis. ADMIN. CODE § NR 447.13(1)(a)3. "because RACM was stripped from facility components and it was not sealed in leak-tight containers."

Here, as in *Schweda*, "the claims alleged in the State's complaint do not depend upon allegations of harm in order to lie." *See id.*, 303 Wis. 2d 353, ¶ 36. Instead, SCS is liable "regardless of harm." *See id.*

¶ 66. SCS has not satisfied the first prong of the *Village Food* test. *See id.*, 254 Wis. 2d 478, ¶ 11. As such, we need not address the second prong. *See Schweda*, 303 Wis. 2d 353, ¶ 42 ("Because the causes of action fail the first prong of the *Village Food* test, they fail the second prong of the test as well. If they did not exist in 1848, they could not have been regarded as actions at law in 1848."). We conclude that the trial court correctly granted the State's motion to strike SCS's demand for a jury.[11]

---

[11] In a further effort to support its position that the causes of action asserted against it should be treated as public nuisance claims that existed at common law, SCS cites Wis. STAT. § 299.95 as reflecting that "the statutes authorizing this action are rooted in the concept of public nuisance." Section 299.95 provides:

The attorney general shall enforce chs. 281 to 285 .... For purposes of this proceeding where chs. 281 to 285 and 289 to 295

251

*By the Court.*—Judgment affirmed.

or this chapter or the rule, special order, license, plan approval, permit or certification prohibits in whole or in part any pollution, a violation is considered a public nuisance.

The regulations at issue are promulgated under WIS. STAT. ch. 285. *See* WIS. ADMIN. CODE § NR 447.01. The reference to "a public nuisance" in § 299.95, however, did not deter the *Schweda* court from reaching the conclusion that it did. *See State v. Schweda*, 2007 WI 100, ¶ 112, 303 Wis. 2d 353, 736 N.W.2d 49 (Prosser, J., concurring in part; dissenting in part). Likewise, it does not deter us from reaching the conclusion that we do.